PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 13-1237
———

IN RE:  GRAND JURY SUBPOENA
———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-10-gj-00127-002)
District Judge:  Honorable Gene E. K. Pratter
———

Argued September 25, 2013
Before:  AMBRO, FISHER and HARDIMAN, *Circuit Judges*.

(Filed: February 12, 2014)

Ian M. Comisky (ARGUED)
Matthew D. Lee
Blank Rome
130 North 18th Street
One Logan Square
Philadelphia, PA  19103

Stephen R. LaCheen (ARGUED)
LaCheen Wittels & Greenberg
1429 Walnut Street, Suite 1301
Philadelphia, PA 19102
        *Counsel for Appellant, John Doe*

Michelle Morgan (ARGUED)
Peter F. Schenck
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee, United States*

OPINION OF THE COURT

FISHER, *Circuit Judge*.

Corporation and Client (together, "Intervenors") are targets of an ongoing grand jury investigation into alleged violations of the Foreign Corrupt Practices Act ("FCPA"). The grand jury served a subpoena on Intervenors' former attorney ("Attorney") and the Government moved to enforce this subpoena and compel Attorney's testimony, based upon the crime-fraud exception to the attorney-client privilege. Intervenors sought to quash the subpoena by asserting the attorney-client privilege and work product protection. After questioning Attorney *in camera*, the District Court found that the crime-fraud exception applied and compelled Attorney to testify before the grand jury.

Intervenors appeal, challenging the District Court's decision to conduct an *in camera* examination, the procedures it fashioned for the examination, and the court's ultimate finding that the crime-fraud exception applies. We hold that the standard announced in *United States v. Zolin*, 491 U.S. 554, 572 (1989), applies to determine whether to conduct an *in camera* examination of a witness. We also find that the District Court did not abuse its discretion in applying this standard, in determining procedures for the examination, or in ultimately finding that the crime-fraud exception applies. We therefore affirm the District Court's order enforcing the grand jury subpoena.

## I.

## A.

This matter is before us in the context of an ongoing grand jury investigation. To maintain confidentiality, we will refer only to the facts that have been made public and will refer to those involved as "Corporation," "Client," and "Attorney" in order to maintain their anonymity. We also note that we and the District Court had access to information pertaining to the alleged criminal violations via the Government's *Ex Parte* Affidavit, which set forth the basis for the Government's belief that the Intervenors committed FCPA violations. Intervenors were not apprised of this information. Additionally, we were informed by Attorney's account of the communications at issue, which were divulged to the District Court during the *in camera* examination. Neither the Government nor the Intervenors were privy to this account. As such, we are hampered in our ability to articulate the background information underlying our conclusions.

Intervenors are the targets of an ongoing grand jury investigation in the Eastern District of Pennsylvania seeking to determine whether they made corrupt payments to obtain business in violation of the FCPA. Corporation is a consulting firm headquartered in Pennsylvania and Client is Corporation's President and Managing Director. The grand jury investigation stems from Intervenors' business transactions with a financial institution ("the Bank") headquartered in the United Kingdom and owned by a number of foreign countries. Between 2007 and 2009, Corporation was retained as a financial advisor by five companies to provide assistance in obtaining financing from the Bank for

3

oil and gas projects. Two of the five projects were approved and financed by the Bank, resulting in the payment of nearly $8 million in success fees to Corporation. For all five projects, "Banker," an official and banker at the Bank, was the operation leader responsible for overseeing the financing process. In 2008 and 2009, Corporation made payments totaling more than $3.5 million to Banker's sister. The payments occurred within months of the success-fee payments to Corporation. No evidence showed that Banker's sister worked on or was involved in any of the projects or meaningfully contributed to any of Corporation's other ventures.

Attorney worked out of Corporation's office but practiced law independently. In exchange for permitting Attorney to work out of the office rent-free, Client would periodically consult Attorney on ordinary legal matters. Attorney had several brief interactions with Client regarding one of the successful financing projects. In April 2008, Client approached Attorney to discuss issues he was having with the project. Client explained that he planned on paying Banker in order to ensure that the project progressed swiftly, as Banker was threatening to slow down the approval process. Attorney did some preliminary research, found the FCPA, and asked Client whether the Bank was a government entity and whether Banker was a government official. Although Attorney could not ascertain given his limited research whether the planned action was legal or illegal, he advised Client not to make the payment. Despite this advice, Client insisted that his proposed payment did not violate the FCPA, and informed Attorney that he

4

would go ahead with the payment. Attorney gave Client a copy of the FCPA. After this communication, Attorney and Client ended their relationship.[1]

In February of 2010, the Bank began an internal investigation into the transactions between Intervenors and Banker's sister. The Overseas Anti-Corruption Unit ("the Unit") in the United Kingdom was informed of the situation, and the Unit informed the Federal Bureau of Investigation ("FBI"). The Unit arrested Banker and Banker's sister in the United Kingdom; their prosecution is ongoing. The FBI began its investigation into Intervenors in February 2010. Due to the parallel prosecution of Banker and Banker's sister in the United Kingdom, Intervenors have some knowledge of the nature of the grand jury investigation of which they are subjects.

### B.

The grand jury served Attorney with a subpoena. On June 18, 2012, the Government moved to enforce the subpoena, seeking an order directing Attorney to appear and testify before the grand jury. On September 4, 2012, Corporation and Client moved to intervene, and the District Court granted this request. After briefing, the District Court determined that it would conduct an *in camera* examination of Attorney outside the presence of Intervenors and the Government to determine the applicability of the crime-fraud exception to the communications between Attorney and Client. The

---

[1] We recognize that even this vague recitation of the communications between Attorney and Client would ordinarily be covered by the attorney-client privilege. We reveal this account of the communications only because we have found that the crime-fraud exception applies.

District Court invited Intervenors and the Government to submit questions for the District Court to ask Attorney, which both did.

On January 8, 2013, the District Court questioned Attorney *in camera*, with only Attorney's own counsel present. After this examination, Intervenors requested that the District Court release a transcript of Attorney's testimony so that they could argue that the communications were not subject to the crime-fraud exception. On January 18, 2012, the District Court issued a memorandum and order granting the Government's motion to enforce the subpoena and directing Attorney to testify before the grand jury. Based upon its review of the Government's *Ex Parte* Affidavit and Attorney's *in camera* testimony, the District Court found a reasonable basis to suspect that Intervenors intended to commit a crime when Client consulted Attorney and could have used the information gleaned from the consultation in furtherance of the crime. The District Court also declined to release a transcript of the testimony. Intervenors timely appealed and the District Court granted a stay of its order compelling Attorney's grand jury testimony pending resolution of this appeal.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. Ordinarily, this Court has jurisdiction only over final decisions of district courts. 28 U.S.C. § 1291. When a district court orders a witness to testify or produce documents, the order is generally not immediately appealable; rather, the witness who wishes to object "must refuse compliance, be held in contempt, and then appeal the contempt order." *In re Grand Jury*,

705 F.3d 133, 143 (3d Cir. 2012) (internal quotation marks and citation omitted). However, under *Perlman v. United States*, 247 U.S. 7 (1918), a privilege holder may immediately appeal an adverse disclosure order when the privileged information is controlled by a "disinterested third party who is likely to disclose that information rather than be held in contempt for the sake of an immediate appeal." *In re Grand Jury*, 705 F.3d at 138. Attorney is a disinterested third party controlling allegedly privileged information. As such, this Court has jurisdiction to hear the appeal brought by Intervenors, the privilege holders.

"We exercise de novo review over the legal issues underlying the application of the crime-fraud exception to the attorney-client privilege." *In re Impounded*, 241 F.3d 308, 312 (3d Cir. 2001). "Once the court determines there is sufficient evidence of a crime or fraud to waive the attorney-client privilege, we review its judgment for abuse of discretion." *Id.* at 318. We review procedures used by the district court for abuse of discretion. *See In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000) ("We conclude that the District Court did not abuse its discretion in denying Appellant and/or his attorney access to this information to protect grand jury secrecy.").

III.

Central to the issues in this case is the attorney-client privilege, the "oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The "privilege protects from disclosure confidential communications made between attorneys and clients for the purpose of

7

obtaining or providing legal assistance to the client." *In re Grand Jury*, 705 F.3d at 151. Although the communications are often relevant and highly probative of the truth, they are protected in order "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389.

Despite their importance, the protections afforded by the privilege are not absolute. "[T]he reason for that protection . . . ceases to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing." *Zolin*, 491 U.S. at 562-63 (internal quotation marks, alterations, and citations omitted). "To circumvent [the attorney-client] privilege[] under the crime-fraud exception, the party seeking to overcome the privilege . . . must make a *prima facie* showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud." *In re Grand Jury*, 705 F.3d at 151 (quoting *In re Grand Jury Subpoena*, 223 F.3d at 217) (internal quotation marks omitted). Because it is often difficult or impossible to prove that the exception applies without delving into the communications themselves, the Supreme Court has held that courts may use *in camera* review to establish the applicability of the exception. *Zolin*, 491 U.S. at 568-69. We explore the contours of *in camera* review and the ultimate crime-fraud finding in this appeal.

A.

Intervenors raise issues with: the standard that the District Court applied to determine whether to conduct an *in camera* examination, its decision to hold an examination in this case, and the procedures that it used in that examination.[2] We hold that the District Court applied the proper standard and did not abuse its discretion in finding that the standard applied or in fashioning procedures for the examination.

1.

In *Zolin*, the Supreme Court announced the inquiry that should precede an *in camera* review of documents to determine the applicability of the crime-fraud exception. 491 U.S. at 572. The Court stated that a district court "should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* (internal quotation marks and citation omitted). In *Zolin*, the government sought to compel the production of tapes of communications and documents covered by the attorney-client privilege under the exception. *Id.* at 557.

---

[2] Intervenors also argue that the District Court's examination of the Attorney violated the separation of powers doctrine. This claim plainly misunderstands the roles of the grand jury in investigating independently from any branch of government and of the district court in ensuring that the grand jury does not infringe upon common law privileges. The grand jury belongs to no branch of the government, instead "serving as a kind of buffer or referee between the Government and the people." *In re Impounded*, 241 F.3d at 312 (quoting *United States v. Williams*, 504 U.S. 36, 47 (1992)) (internal quotation marks omitted). The District Court was fulfilling its obligation to check the grand jury's investigative power by reviewing the grand jury subpoena in order to protect the attorney-client privilege. *See id.* at 313.

Intervenors assert that due to key differences between documented materials and the oral examination of an attorney, the latter should be subject to a more stringent standard than that announced for the former in *Zolin*.

In determining the standard that should apply to *in camera* examination of a witness about oral communications, we first note that the Supreme Court did not exclude oral communications from the ambit of its holding. *Id.* at 574. Nevertheless, *in camera* examination of a witness implicates different concerns than examination of documents or recordings, so we must determine whether we should adopt the *Zolin* standard where unmemorialized oral communications are at issue.

In determining whether there ought to be a threshold showing for *in camera* review, the Supreme Court articulated three concerns with the use of *in camera* examinations: erosion of the privilege that is aimed at fostering disclosure between attorney and client, due process implications, and additional burdens on the district courts. *Id.* at 571. Intervenors present an additional concern – the malleability of witness recollections. We will weigh these concerns against the need to prove the applicability of the crime-fraud exception.

While the "policy of protecting open and legitimate disclosure between attorneys and clients" is of the utmost importance, *id*. at 571, a district court's examination of a witness does no more to erode the protection than examination of written or recorded communications. Applying the same standard in both situations allows for equal accountability when the communications, whether at the behest of the client or not, were

never chronicled. If we were to apply a heightened standard to oral communications, would-be criminals could use the differing standards to avoid the proper application of the crime-fraud exception. A client could seek to take advantage of the higher showing necessary to delve into oral communications by instructing the attorney not to record the communications in any way. We do not want to incentivize circumventing the proper application of the crime-fraud exception. As for the due process implications, we believe that a district court can properly be entrusted to consider the due process interests and circumstances in each case, and use its discretion to fashion a proper procedure for the *in camera* examination. With respect to the third concern, an *in camera* examination of a witness is more burdensome on the district court than examination of documents. The district court must fashion procedures for the examination, bring the witness into court, and conduct the hearing. However, the concern that the examination may be more burdensome does not indicate to us that such an examination should only be undertaken on a higher showing. This would serve to insulate some oral communications from the crime-fraud exception – an "intolerably high" cost. *Id.* at 569.

Intervenors' concern about the pliability of a witness's memory is a substantial one. An attorney's memory about the interaction with the client could be influenced by the mere fact that the crime-fraud exception is implicated, and the circumstances of how a question is asked can affect how the information is remembered and reported. There are also "dangers of inaccuracy and untrustworthiness" in probing into the memory of an attorney regarding past communications that do not occur with documented

communications.  *Hickman v. Taylor*, 329 U.S. 495, 512-13 (1947) ("Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness.").  Despite these concerns, we are confident that district courts will be able to question an attorney-witness in a way that ensures that the attorney accurately recounts the communications with the client.  The risk of inaccuracies is mitigated by the fact that the attorney will be under oath and face questioning from a judge rather than an adversary.  The concern over the malleability of witness memory does not outweigh the importance of ensuring that abuses of the privilege are exposed.  Some abuses of the privilege cannot be demonstrated by extrinsic evidence, so forbidding consideration of the communications would be "too great an impediment to the proper functioning of the adversary process."  *Zolin*, 491 U.S. at 569.

For these reasons, we hold that district courts should use the *Zolin* standard to determine whether to examine a witness *in camera*.  Before a district court can undertake an *in camera* examination of an attorney-witness to determine the applicability of the crime-fraud exception, the party seeking to overcome the privilege must make a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *Id.* at 572 (internal quotation marks and citation omitted).

12

This conclusion is not inconsistent with previous decisions of this Court. *See In re Grand Jury Investigation*, 445 F.3d 266, 280 (3d Cir. 2006) (affirming the district court's finding that the crime-fraud exception applied where the district court had examined attorneys *in camera*); *In re Grand Jury Subpoena*, 223 F.3d at 216 (observing that use of *in camera* proceedings or *ex parte* affidavits is a procedure consistently endorsed to preserve grand jury secrecy). Nor is it inconsistent with decisions from other courts of appeals. *See, e.g.*, *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (finding that a district court's *in camera* examination of an attorney after the threshold *Zolin* showing was made comported with due process).

The District Court properly applied the *Zolin* standard and the Government's *Ex Parte* Affidavit sufficiently fulfilled this standard. The *Ex Parte* Affidavit contained details from the FBI investigation into the projects involving the Bank for which Corporation served as an advisor. The Affidavit also contained Attorney's statement to the FBI that Attorney was consulted about a financing project, although Attorney did not reveal the details of this communication. For these reasons, the District Court did not err in concluding that there was a factual basis to support a good faith belief that *in camera* examination of Attorney might reveal evidence establishing the applicability of the crime-fraud exception and in conducting an *in camera* examination of Attorney.

2.

Intervenors contest the District Court's decision to exclude them from the *in camera* examination of Attorney and its refusal to release a transcript or summary of the

13

examination. In considering Intervenors' request to attend the *in camera* examination, the District Court concluded that the balance between the need for grand jury secrecy and protection of the attorney-client privilege could only be met if neither Intervenors nor the Government were present during the examination of Attorney. The District Court denied Intervenors' request for a transcript, redacted transcript, or summary of the examination testimony for similar reasons. The District Court explained, "[b]ecause the grand jury proceeding here is ongoing and because the transcript almost certainly reflects a preview of [Attorney's] eventual grand jury testimony, . . . secrecy concerns outweigh any need for Intervenors to review the transcript of [Attorney's] *in camera* interview."

Intervenors argue that what transpired *in camera* is not a grand jury secret, because Attorney's recollections exist separate and apart from the grand jury investigation. The Government responds that Intervenors are not precluded from interviewing Attorney about his conversation with Client, if Attorney is willing. In this way, Attorney's recollections are not grand jury secrets.

The Government argues, on the other hand, that the questions posed by the District Court, some of which were submitted by the Government, do constitute grand jury secrets. The Government maintains that the Intervenors should be prevented from uncovering what the Government wished to ask Attorney. Intervenors respond that they already know what the grand jury is investigating due to the parallel prosecution in the United Kingdom.

14

The District Court did not abuse its discretion in excluding the Intervenors from the interview or declining to release a transcript or summary of the testimony. The District Court noted that even though secrecy concerns are minimized by the parallel case in the United Kingdom, "there appears to be a significant amount of information before the grand jury that is not known to the Intervenors." The District Court did not err in so concluding. Intervenors are not aware of how much the Government knows. But if they were privy to the *in camera* examination, they could preview not only Attorney's grand jury testimony, but also evidence already submitted to the grand jury, as reflected in the Government's questions, and the Government's eventual trial evidence and strategy. Even though some information regarding the investigation is public, the content of this interview is entitled to protection as a grand jury secret. *See In re Grand Jury Subpoena*, 233 F.3d at 219 ("Given the acknowledged need for secrecy in grand jury proceedings, we reject Appellant's argument that the 'unique facts and circumstances in this case,' including . . . the fact that the nature of the investigation has already been made public in several contexts, required the District Court to order disclosure of the government's *ex parte* affidavit."). We therefore conclude that the District Court did not abuse its discretion in adopting these procedures for the *in camera* proceeding.

B.

Intervenors challenge the District Court's determination that the crime-fraud exception applies to their communications with Attorney. In this circuit, the crime-fraud exception to the attorney-client privilege applies "[w]here there is a reasonable basis to

15

suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud . . . ." *In re Grand Jury*, 705 F.3d at 153.[3]

We review the District Court's determination that there is sufficient evidence for the crime-fraud exception to apply for an abuse of discretion. *In re Impounded*, 241 F.3d at 318. We begin by acknowledging that this was a close case. The communication between Attorney and Client was brief, and consisted mainly of informing Client of the applicable law and advising that he not make the payment. However, we believe that the questions posed by Attorney to Client and the information that Client could gain from

---

[3] Intervenors argue on appeal that the District Court erred in applying this standard for the crime-fraud exception. They maintain that the panel in *In re Grand Jury* improperly overruled prior precedent to create this standard. In *In re Grand Jury Subpoena*, we held that "to invoke the exception, the government must make a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud." 223 F.3d at 217 (internal citations omitted). We then clarified that "[a] 'prima facie showing' requires presentation of 'evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.'" *Id.* (quoting *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 95-96 (3d Cir. 1992)).

The *In re Grand Jury* panel observed that "sufficient to support" was "not particularly helpful," as it "begs the quantum-of-proof question because it does not quantify what evidence is sufficient." 705 F.3d at 152. The Court sought to clarify the standard, and examined Third Circuit precedent to conclude "that our precedent is properly captured by the reasonable basis standard." *Id.* at 153.

The *In re Grand Jury* panel followed what was "binding," *see* IOP 9.1; "sufficient to support" was not a holding, but part of a standard that we clarified. The panel further clarified that for a presentation of evidence to be "sufficient," there must be a "reasonable basis to suspect" that the elements of the crime-fraud exception are fulfilled. The *In re Grand Jury* Court did not improperly overrule the holding from a prior opinion; rather, it clarified an applicable precedent to delineate a more specific standard. Therefore, we adhere to the "reasonable basis to suspect" standard.

16

those questions are sufficient for us to conclude that the District Court did not abuse its discretion in determining that the advice was used in furtherance of a crime or fraud.

For the crime-fraud exception to apply, the client must be "committing or intending to commit a crime or fraud" at the time he or she consults the attorney. *In re Grand Jury*, 705 F.3d at 153. This requirement is stated in the present tense, and does not by its terms apply to a situation where a client consults an attorney about a possible course of action and later forms the intent to undertake that action. We have also observed that the attorney-client privilege "is not lost if the client innocently proposes an illegal course of conduct to explore with his counsel what he may or may not do." *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005). The exception does not apply where the client forms the intent to engage in criminal or fraudulent activity after the consultation.

Other courts of appeals have specifically clarified when the client must have developed the requisite intent. The Second Circuit explained that because the exception only applies where the communications "were intended in some way to facilitate or to conceal the criminal activity," *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997) (quoting *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986)) (internal quotation marks omitted), it is required "to show that the wrong-doer had set upon a criminal course *before* consulting counsel." *Id.* (emphasis in original). *See also In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) ("The evidence must show that the client was engaged in or was planning the criminal or fraudulent conduct when it sought the assistance of counsel . . . ."); *In re Grand Jury Proceedings*, 87 F.3d

17

377, 381 (9th Cir. 1996) ("To trigger the crime-fraud exception, the government must establish that 'the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme.'" (quoting *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)).

A hypothetical question posed by Judge Ambro at oral argument highlights the importance of the timing of intent. A client consults with an attorney, intending at the time to go as close to the line of illegality as possible but to remain within the realm of legal conduct. The client tells the attorney of a possible course of conduct and asks for advice on the applicable law. The attorney gives advice, explaining which actions would be legal and which actions would be illegal. A year later, the client decides that he or she will cross the line from legal to illegal. Here, the crime-fraud exception would not apply, because the client was not committing a crime or fraud or intending to commit a crime or fraud at the time he or she consulted the attorney. Even if the client clearly used the advice obtained a year earlier in furtherance of the crime or fraud, the exception would not apply because the client did not have the requisite intent at the time of the consultation.

In this case, the District Court did not abuse its discretion in determining that Client intended to commit a crime at the time he consulted with Attorney in April 2008. The evidence shows Client's intent to make a payment to Banker in order to ensure that the project was approved in a timely manner. We can infer Client's pre-existing intent to make the payment in part from his statement to Attorney that he was going to make the

18

payment anyway, after Attorney advised him that he should not do so. This suggests that Client had already considered the advisability of making the payment, and determined that it was in his best interest to do so. The fact that the payment occurred in the same month that the Bank approved the project financing also indicates that Client planned on making the payment when he consulted with Attorney. Given the information available to the District Court, we cannot say that it abused its discretion in concluding that Client "set upon an illegal course before seeking [Attorney's] advice about the scheme's legality." *Jacobs*, 117 F.3d at 89.

In delineating the connection required between the advice sought and the crime or fraud, we have repeatedly stated that the legal advice must be used "in furtherance" of the alleged crime or fraud. We have rejected a more relaxed "related to" standard, *In re Grand Jury Investigation*, 445 F.3d at 277, and explained that the legal advice must "'give[] direction for the commission of future fraud or crime,'" *In re Grand Jury Subpoena*, 223 F.3d at 217 (quoting *Haines*, 975 F.2d at 90). Most recently, in *In re Grand Jury*, we observed, "[a]ll that is necessary is that the client misuse or intend to misuse the attorney's advice in furtherance of an improper purpose." 705 F.3d at 157. It is therefore clear from prior precedent that for advice to be used "in furtherance" of a crime or fraud, the advice must advance, or the client must intend the advice to advance, the client's criminal or fraudulent purpose. The advice cannot merely relate to the crime or fraud.

If the attorney merely informs the client of the criminality of a proposed action, the crime-fraud exception does not apply. For example, consider the situation where a client, intending to undertake an illegal course of action, consults a first attorney, tells the attorney the proposed course of action, and the attorney advises that the course of action is illegal. The client, dissatisfied with the first attorney's answer, then consults a second attorney. The client tells the attorney the same proposed course of action, but this attorney says yes, that course of action is legal. Both of these consultations would remain privileged, because the attorneys merely opined on the lawfulness of a particular course of conduct, and this advice cannot be used "in furtherance" of the crime.

The situation here is different. In addition to the advice Attorney provided to Client that he should not make a payment, Attorney also provided information about the types of conduct that violate the law. We cannot say that the District Court abused its discretion in determining "that there is a reasonable basis to conclude that [Attorney's] advice was used by [Intervenors] to fashion conduct in furtherance of [their] crime." Specifically, Attorney's questions about whether or not the Bank was a governmental entity and whether Banker was a government official would have informed Client that the governmental connection was key to violating the FCPA. This would lead logically to the idea of routing the payment through Banker's sister, who was not connected to the Bank, in order to avoid the reaches of the FCPA or detection of the violation. Of course, it is impossible to know what Client thought or how he processed the information gained from Attorney. But the District Court did not abuse its discretion in determining that

20

Client "could easily have used [the advice] to shape the contours of conduct intended to escape the reaches of the law." For these reason, we affirm the District Court's finding that the crime-fraud exception applies and its order compelling Attorney to testify before the grand jury.

C.

Intervenors assert that Attorney's testimony is protected by the work product doctrine. The District Court did not address this issue; however, it was fully briefed before the District Court. "The work-product doctrine . . . protects from discovery materials prepared or collected by an attorney 'in the course of preparation for possible litigation.'" *In re Grand Jury Investigation*, 599 F.2d 1224, 1228 (3d Cir. 1979) (quoting *Hickman*, 329 U.S. at 505). The burden of proving the applicability of the work product privilege rests upon the party asserting the privilege. *Haines*, 975 F.2d at 94. A lawyer "may assert the work product privilege," and "[t]o the extent a client's interest may be affected, he, too, may assert the work product privilege." *In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir. 1979). Intervenors have attempted to assert the work product privilege on their own behalf and on Attorney's behalf, arguing that an innocent attorney can prevent disclosure of work product even if the client used it to further a crime or fraud. Attorney did not raise the work product issue before the District Court and Intervenors cannot assert the privilege on his behalf. Therefore, we need not address whether an innocent attorney may raise the privilege when there is a crime-fraud finding.

21

A crime-fraud finding overcomes the work product privilege. "Where there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the . . . attorney work product w[as] used in furtherance of the alleged crime or fraud, this is enough to break the privilege." *In re Grand Jury*, 705 F.3d at 153. Because, as discussed *supra,* we affirm the District Court's crime-fraud finding, the work product privilege does not apply. Nevertheless, even without the crime-fraud finding, the communications between Intervenors and Attorney do not qualify as protected work product because they were not made "in the course of preparation for possible litigation." *In re Grand Jury Investigation*, 599 F.2d at 1228 (quoting *Hickman*, 329 U.S. at 505). "Work product prepared in the course of business is not immune from discovery." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000). Although the "legal theories, research, and fact material gathered" here could be considered intangible work product, *In re Grand Jury Proceedings*, 604 F.2d at 801, Attorney's recollections and research are not protected because they were not made in preparation for possible litigation. When Intervenors consulted Attorney in April 2008, there was no litigation on the horizon. Investigation into the transactions that led to the grand jury investigation began nearly two years later. The consultation was made in the ordinary course of a business transaction; therefore, Attorney's recollections are not protected work product.

22

IV.

For the foregoing reasons, we affirm the order of the District Court enforcing the grand jury subpoena.