**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: June 17, 2021
Date Decided: August 25, 2021

Brian E. Farnan
Michael J. Farnan
Farnan LLP
919 North Market Street
Wilmington, Delaware 19801

Blake Rohrbacher
Alexander M. Krischik
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

RE: *Drachman v. BioDelivery Sciences International, Inc.*
C.A. No. 2019-0728-LWW

Dear Counsel:

Before me are two motions to compel. The motions—filed by the plaintiffs on September 30, 2020 and May 6, 2021—both seek production of the same document. The document is an email chain that was first attached in redacted form as an exhibit to a brief the defendants filed. The defendants later inadvertently produced the document in discovery without redactions, clawed it back, and reproduced it with slightly different redactions. The parties agree that the redacted portions of the email are subject to the attorney-client privilege. They disagree about whether certain exceptions to the privilege apply and whether privilege has been waived.

For the reasons explained below, I conclude that neither the so-called *Garner* doctrine nor the crime-fraud exception to the attorney-client privilege apply. I also find that the defendants have not waived privilege by placing the document "at issue" or using the document as a "sword and shield." The plaintiffs' motions to compel are denied.

## I.     BACKGROUND[1]

This litigation concerns two proposals that BioDelivery Sciences International, Inc.'s Board of Directors submitted for stockholder approval at BioDelivery's 2018 annual meeting. The proposals sought to amend BioDelivery's certificate of incorporation to declassify its Board and change the voting standard for uncontested director elections from a plurality standard to a majority voting standard. Under 8 *Del. C.* § 242(b), the approval of a majority of the outstanding stock entitled to vote was required for the proposals to pass. BioDelivery's proxy advisor, AST Financial, allegedly advised BioDelivery that the required votes had been obtained, despite a significant number of broker non-votes. On August 6, 2018, BioDelivery declared the proposals valid and effectuated the amendments in a filing

---

[1] For a more detailed discussion of the plaintiffs' allegations, see the court's previous ruling on the plaintiffs' Motion for Summary Judgment and Defendants' Motion to Dismiss. *See* Dkt. 35. Unless stated otherwise, the facts recited in this decision are based on the undisputed allegations of the Amended Verified Stockholder Derivative and Class Action Complaint (Dkt. 44) and other uncontested documentary exhibits submitted by the parties.

with the Delaware Secretary of State, certifying that they were "adopted in accordance with the provisions of Section 242."[2]

On July 31, 2019, the plaintiffs made a pre-suit demand on the Board, asserting that the vote violated Section 242 and that the amendments were invalid (the "Demand"). On August 30, 2019, the Board rejected the Demand through its counsel, Goodwin Procter, LLP.[3] The plaintiffs filed this litigation on September 11, 2019. The complaint included three claims: violation of 8 *Del. C.* § 242; breach of fiduciary duty; and a declaratory judgment that the amendments were not validly approved.[4] Regarding their second claim, the plaintiffs alleged that:

> Defendants breached their fiduciary duties and acted in bad faith by (a) deeming the Two Proposals approved in violation of the DGCL, (b) filing the Amendments with the Delaware Secretary of State, (c) implementing the Amendments and (d) refusing to take appropriate action in response to the Demand.[5]

Before the defendants responded to the complaint, the plaintiffs moved for summary judgment.[6] On December 6, 2019, the defendants filed a combined brief in opposition to the plaintiffs' motion for summary judgment and in support of their

---

[2] Aff. of Alexander M. Krischik ("Krischik Aff.") Ex. 1 at 7–8 (Dkt. 14).

[3] Aff. of Douglas E. Julie ("Julie Aff.") Ex. I (Dkt. 7).

[4] Verified S'holders Class Action Compl. (Dkt. 1).

[5] *Id.* ¶ 86.

[6] Dkt. 7.

motion to dismiss under Court of Chancery Rule 12(b)(6).[7] The defendants attached to their brief an August 3, 2018 email exchange between Michelle Brown, Director of Financial Reporting at BioDelivery, and attorneys from Goodwin Procter, including partner Robert Puopolo.[8] The defendants asserted in their brief that the email demonstrates the Board's reliance on the advice of AST that the proposals had passed.[9]

In the version of the document attached to the defendants' brief, the email at the bottom of the chain was redacted except for a heading showing that it was sent from Brown to Puopolo at 1:12 p.m. and that Herm Cukier (then-CEO of BioDelivery) and Ernest R. DePaolantonio (BioDelivery's CFO) were copied.[10] Puopolo's 2:56 p.m. response to Brown was also redacted, other than: "Hi – Herm, I tried to call so if you have a minute, give me a ring . . . ."[11] At 3:30 p.m., Brown responded, designating her email as "Importance: High":

---

[7] Dkts. 13, 14.

[8] Krischik Aff. Ex. 3.

[9] *See* Defs.' Opening Br. 24 n.18 (Dkt. 14); Defs.' Reply Br. 5 n.3 (Dkt. 27).

[10] Krischik Aff. Ex. 3.

[11] After the defendants inadvertently produced—and subsequently clawed back—the unredacted email discussion, the defendants produced to the plaintiffs a copy of the same email that unredacted the last sentence of Puopolo's reply to Brown. *Compare id.*, *with* Pls.' Mot. to Compel Production of Improperly Clawed-Back Doc. ("Pls.' Second Mot. to Compel") Ex. B (Dkt. 69); *see infra* at 8.

> I am on the phone with AST and part of the issue is that Broadridge does not deem proposals 1 and 2 under the same standard as proposal 3, which is why there is almost 22M of broker non-votes sitting there for proposals 1 and 2. We internally too were using the same voting method.

> However, their proxy department is on the line, and they are still telling me that both proposals 1 and 2 have passed, because we can use the method to divide total voted over proxy shares voted.

> Rob, [REDACTED].[12]

On April 14, 2019, then-Chancellor Bouchard denied the defendants' motion to dismiss. Regarding the claim for breach of fiduciary duty, the court found that it was reasonably conceivable that the directors acted in bad faith because the claim "is not just about the initial tabulation of votes, but involves the board's refusal to take action when the tabulation problem was brought to the board's attention."[13] The court drew two inferences from the refusal of the plaintiffs' pre-suit Demand: "One is that the board received and relied on bad legal advice in response to plaintiffs' demand. . . . A second . . . is that the directors just did not care about complying with

---

[12] Krischik Aff. Ex. 3.

[13] Mot. to Dismiss Hr'g Tr. and Rulings of the Court ("Tr.") 53–55 (Apr. 14, 2019) (Dkt. 35). Chancellor Bouchard noted that, "[i]f the complaint merely focused on how the votes were tabulated at the 2018 annual meeting, [he] likely would have a different opinion on the matter." *Id.* at 53. The court also denied the plaintiffs' motion for summary judgment. *Id.* at 46–47.

the legal requirements of Delaware law, which would support a reasonably conceivable claim of bad faith."[14]

Discovery ensued. The plaintiffs demanded that the defendants produce an unredacted copy of the email chain that had been attached to the defendants' brief. On September 30, 2020, after the defendants asserted privilege and refused to produce the unredacted document, the plaintiffs filed their first motion to compel (the "First Motion to Compel").[15] The plaintiffs argue in the First Motion to Compel that they are entitled to the unredacted email under the *Garner* doctrine and because the defendants waived privilege by placing the document "at issue."[16]

On October 13, 2020, the plaintiffs filed an amended complaint with two counts.[17] Count I is the direct breach of fiduciary duty claim that survived the defendants' motion to dismiss.[18] Count II is identical to Count I except that it is styled as a derivative breach of fiduciary duty claim on behalf of BioDelivery.[19]

---

[14] *Id.* at 54–55.

[15] Dkt. 39.

[16] *See* Pls.' Opening Br. in Support of First Mot. to Compel 7–12 (Dkt. 39).

[17] Dkt. 44. On July 23, 2020, BioDelivery stockholders approved the ratification of the amendments, mooting Counts I and III of the original complaint, *i.e.*, violation of Section 242 and a claim for declaratory judgment. On October 8, 2020, the parties stipulated to the dismissal of those claims. Dkt. 42.

[18] *See supra* at 5.

[19] Dkt. 44.

During document discovery, the defendants produced multiple iterations of the challenged email chain. The versions that were produced with privilege redactions were listed on the defendants' redaction log as reflecting "legal advice regarding voting proposals, results, and standards."[20] Multiple versions of the document were produced with consistent redactions, but one version slipped through the cracks. On April 15, 2021, the defendants inadvertently produced to the plaintiffs an unredacted version of the email chain.[21]

It is not clear when the plaintiffs first reviewed the unredacted email chain.[22] On April 29, 2021, counsel for the plaintiffs sent counsel for the defendants a letter purportedly discussing the document.[23] That evening, the defendants told the plaintiffs that the document had been produced without redactions inadvertently and formally clawed it back under Paragraph 19 of the Stipulation and Order for the Production and Exchange of Confidential Information entered in this action.[24] The plaintiffs deleted the email, as required by that Order.[25]

---

[20] Defs.' Opp'n to Second Mot. to Compel Ex. 1 at 9 (Dkt. 74).

[21] Defs.' Opp'n to Second Mot. to Compel ¶ 12; *see also* Pls.' Second Mot. to Compel Ex. B.

[22] *See* Defs.' Opp'n to Second Mot. to Compel Ex. 3 at 1.

[23] *See* Defs.' Opp'n to Second Mot. to Compel Ex. 2.

[24] Dkt. 55.

[25] Pls.' Second Mot. to Compel ¶ 14.

The document was subsequently reproduced with slightly different redactions from the previously produced versions. One redaction was lifted from a 2:56 p.m. email in which Brown said to Cukier, "[w]e will proceed, but wanted to reach out on this."[26] Another redaction was lifted from the word "Ok" in a 7:30 p.m. email from Puopolo to Brown.[27]

On May 6, 2021, the plaintiffs filed a second motion to compel, seeking production of the unredacted email that the defendants had clawed back (the "Second Motion to Compel"). This time, the plaintiffs invoked the crime-fraud exception to the attorney-client privilege and asserted—again—that the email could not be withheld as privileged because it was placed at issue by the defendants.[28] The plaintiffs ask that, if I do not direct the defendants to produce the document, the document be reviewed *in camera*.[29]

## II.    ANALYSIS

Under Court of Chancery Rule 26(b), parties "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and

---

[26] Pls.' Second Mot. to Compel Ex. B.

[27] *Id.*

[28] Pls.' Second Mot. to Compel ¶¶ 15–20.

[29] *See id.* ¶ 14.

proportional to the needs of the case."[30]  One privilege limiting the broad scope of discovery is the attorney-client privilege, codified in Delaware Rule of Evidence 502(b), which insulates from discovery "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client."[31] Unlike Rule 26, which is intended to facilitate "a disinterested search for truth" at trial,[32] the attorney-client privilege "promotes justice by encouraging candor between clients and their attorneys."[33]  But the privilege has limits and, here, the plaintiffs invoke several.

None of the plaintiffs' arguments entitle them to an unredacted version of the document in question.  Disclosure is not appropriate under the *Garner* doctrine because the plaintiffs have not exhausted their discovery avenues at this stage in the case.  I find that the defendants did not place the legal advice in the document "at

---

[30] Ct. Ch. R. 26(b)(1).

[31] Del. R. Evid. 502(b); *Ramada Inns, Inc. v. Dow Jones & Co., Inc.*, 523 A.2d 968, 971 (Del. 1986).

[32] *In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *2 (Del. Ch. July 3, 2013) (quoting *IQ Hldgs., Inc. v. Am. Com. Lines Inc.*, 2012 WL 3877790, at *1 (Del. Ch. Aug. 30, 2012)).

[33] *Buttonwood Tree Value P'rs, L.P. v. R.L. Polk & Co., Inc.*, 2018 WL 346036, at *2 (Del. Ch. Jan. 10, 2018) (citing *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1278 (Del. 2014)).

issue" in the litigation.  And I find that the crime-fraud exception does not apply.

The First and Second Motions to Compel are denied.

### A.     The *Garner* Doctrine

The so-called *Garner* doctrine (or the "fiduciary exception"[34]) was first

articulated by the Fifth Circuit Court of Appeals.  It provides that when a stockholder

sues a fiduciary for behavior inimical to the stockholder's interests, she may invade

the corporation's privilege upon a showing of "good cause." [35]  The *Garner* doctrine

was expressly adopted by the Delaware Supreme Court in *Wal-Mart Stores, Inc. v.*

*Indiana Electrical Workers Pension Trust Fund IBEW.*[36]  In that decision, then-

Justice Holland emphasized that the attorney-client privilege remains "critical" to

"promot[ing] broader public interests" and that the fiduciary exception is "narrow,

exacting, and intended to be very difficult to satisfy."[37]

---

[34] Technically, the *Garner* doctrine did not create an exception to the attorney-client privilege.  But if the elements of *Garner* are satisfied, it may "result in the privilege not applying."  Edward P. Welch, et al., *Mergers & Acquisitions Deal Litigation Under Delaware Corporation Law* (2020 Ed.) § 9.02[A][b] (citing *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 1987 WL 12500 (Del. Ch. June 19, 1987)).  The "fiduciary exception" is therefore often described as such.  *See In re Fuqua Indus., Inc.*, 2002 WL 991666, at *4 (Del. Ch. May 2, 2002).

[35] *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).

[36] 95 A.3d 1264 (Del. 2014).

[37] *Id.* at 1278 (alterations in original).

Under *Garner*, the movant must "first establish that a mutuality of interest existed between the parties" at the time of the relevant communication before the court will consider whether "good cause" compels production of privileged material.[38] "Because [a] director is obligated to act in the best interest of the corporation and its shareholders, there is a mutuality of interest among the director, the corporation, and the shareholders when such legal advice is sought."[39] This mutuality of interests has led Delaware courts to recognize the tension created when a corporation "assert[s] the privilege through its agents, *i.e.*, its officers and directors, who must 'exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals.'"[40]

Ultimately, "the *Garner* exception balances 'the privilege's purpose of encouraging open communication between counsel and client [against] . . . the right of a stockholder to understand what advice was given to fiduciaries who are charged with breaching their duties.'"[41] Delaware courts have applied the *Garner* exception sparingly to preserve the balance between these competing interests.

---

[38] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 1999 WL 66528, at *2 (Del. Ch. Jan. 26, 1999).

[39] *Fuqua*, 2002 WL 991666, at *3.

[40] *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993) (quoting *Commodity Futures Trading Com. v. Weintraub*, 471 U.S. 343, 349 (1985)).

[41] *Buttonwood*, 2018 WL 346036, at *3 (alterations in original) (quoting *de Vries v. Diamante Del Mar, L.L.C.*, 2015 WL 3534073, at *4 (Del. Ch. June 3, 2015)).

*Garner* provides a non-exhaustive list of nine factors to be considered when analyzing whether the doctrine applies:

[1] the number of shareholders and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communication related to past or to prospective actions; [7] whether the communication is of advice concerning the litigation itself; [8] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [9] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.[42]

The Fifth Circuit did not place weight on certain factors over others, but Delaware courts place "particular significance" on three: "(1) the colorability of the claim; (2) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (3) the apparent necessity or desirability of shareholders having the information and availability of it from other sources."[43] The first two factors "are gatekeepers; they function as sieves to strain out frivolous attempts to vitiate the privilege."[44] If those "gates" are cleared, the court must weigh

---

[42] *Garner*, 430 F.2d at 1104.

[43] *Salberg v. Genworth Fin., Inc.*, 2017 WL 3499807, at *5 (Del. Ch. July 27, 2017).

[44] *Buttonwood*, 2018 WL 346036, at *3.

the competing interests of the stockholder's need for discovery and maintaining corporate privilege.[45]

The parties focus on these three factors. The plaintiffs contend that their breach of fiduciary duty claim is colorable, that their request is targeted, and that the information they seek is both necessary to prove their allegations of bad faith and is unavailable from other sources. The defendants disagree with each point. Although I agree with the plaintiffs on certain issues, the defendants have the better of the arguments.

Colorability. The plaintiffs' claim for breach of fiduciary duty is colorable. The parties debate whether the court's denial of the motion to dismiss the direct breach of fiduciary duty claim (now Count I) is sufficient to satisfy this factor or whether the more-recently pleaded derivative claim (Count II) must first survive a motion to dismiss.[46] To await a decision on the viability of the plaintiffs' derivative claim is unnecessary for two reasons.

First, a claim is colorable under *Garner* if it survives a motion to dismiss,[47] and (other than the direct versus derivative distinction) Counts I and II are identical.

---

[45] *See id.* at *5–6.

[46] *See* Pls.' Reply Br. in Further Support of First Mot. to Compel Disc. 2–3 (Dkt. 48); Defs.' Opp'n to First Mot. to Compel ¶¶ 19–20 (Dkt. 45).

[47] *Buttonwood*, 2018 WL 346036, at *5 & n.20 (collecting cases).

The complaint is not "untested."[48]  The court already found that Count I is viable under the Rule 12(b)(6) standard and explained that the manner in which BioDelivery responded to the Demand implicated broader fiduciary principles than the tabulation of votes at the annual meeting.[49]  It would be inefficient and unnecessary to also require Count II to survive a Rule 23.1 motion to dismiss for purposes of a *Garner* analysis.[50]

Second, the fact that only the direct claim has survived a motion to dismiss does not mean that the colorability factor is unsatisfied.  The *Garner* doctrine is typically applied to derivative claims where a stockholder is not seeking a recovery only for herself, but the plaintiffs here are seeking to recover for themselves *and* on behalf of BioDelivery.  Whether they are ultimately able to act on BioDelivery's behalf for Count II does not change the reality that, at present, the corporation is asserting privilege against a stockholder who purports to represent its interests.  In any event, the Court of Chancery has previously found that the *Garner* doctrine may apply to a direct breach of fiduciary duty claim.[51]

---

[48] Defs.' Opp'n to First Mot. to Compel ¶ 20.

[49] Tr. 53–55.

[50] It bears noting that a motion to dismiss pursuant to Rule 23.1 has been briefed, argued, and submitted for decision by this court.

[51] *See In re Freeport-McMoRan Sulphur, Inc. S'holder Litig.*, 2005 WL 5756737, at *4 (Del. Ch. Jan. 26, 2005); *see also Buttonwood*, 2018 WL 346036, at *5 (noting that

Specificity.    The second factor—the extent to which the document is identified—also supports disclosure of the document.  The plaintiffs are not "blindly fishing."[52]  They have pinpointed a single email chain that is indisputably relevant to their claims.  There can be no argument by the defendants that the production of one document would be "overly burdensome."[53]

The defendants' sole argument in response is that the plaintiffs are "fishing" to support their breach of fiduciary duty claim in order to (as the plaintiffs have said) "make an informed decision about how to proceed in this case."[54]  That may be true. But it has no bearing on the application of this factor, which focuses on whether the documents can be specifically identified.  The plaintiffs' demand for a single document easily satisfies this factor.

Availability.  The plaintiffs have cleared the gates of the first two factors.  But their path to disclosure ends with the third factor, which requires the court to assess

---

"[l]ogically it [would] appear[]" *Garner* is applicable to direct claims, with the nature of the action factored into the balancing of interests).

[52] Defs.' Opp'n to First Mot. to Compel ¶ 16 (quoting *Salberg*, 2017 WL 3499807, at *4).

[53] *de Vries*, 2015 WL 3534073, at *8.

[54] Defs.' Opp'n to First Mot. to Compel ¶ 25 (quoting Pls.' Opening Br. in Support of First Mot. to Compel 11).

whether the information sought is both unavailable from other sources and necessary for the stockholder to prove her claim.[55]

This court has held that when a stockholder-plaintiff can seek information from other sources without violating the attorney-client privilege, she cannot resort to the fiduciary exception to plead her case.[56]  Based on the record before me, it appears that the plaintiffs are attempting to employ *Garner* to short-circuit the discovery process.  At the time the First Motion to Compel was filed, the plaintiffs had not deposed a single individual and had served one set of interrogatories.  Since then, they have served document requests and a second set of interrogatories.  They have still not taken a deposition.[57]  Given the important considerations that weigh in favor of preserving privilege, it would be inequitable to invade that privilege at the outset of discovery before the plaintiffs have exhausted other avenues.[58]  That alone requires a denial of the First Motion to Compel insofar as it invokes the *Garner* exception.

---

[55] *See Buttonwood*, 2018 WL 346036, at *5.

[56] *In re Fuqua Indus., Inc. S'holder Litig.*, 1999 WL 959182, at *3 (Del. Ch. Sept. 17, 1999).

[57] *Id.* (denying motion where "further depositions may provide the answers [plaintiffs] seek without infringing upon the attorney-client privilege").

[58] *Id.*; *see also Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 569 (Del. Ch. 1998) (permitting disclosure under the *Garner* exception only where "the documents sought [were] unavailable from any other source").

In addition, it is far from apparent to me that the information the plaintiffs seek to glean from the redacted portions of the document is "necessary" to their claim. The plaintiffs cannot presently link the August 2018 email chain discussing vote-counting for the amendments with advice Goodwin Procter gave a year later about rejecting the Demand. Whether the privileged email discussion could be helpful (much less necessary) to their assertions of bad faith wrongful refusal seems dubious. Only one defendant (Cukier) is copied on the email.[59] And other than the presence of Goodwin Procter, the plaintiffs have not presented a common thread between the email and the rejection of the Demand.

The plaintiffs are correct that there are key aspects of the record that they must develop, including "who [the defendants] consulted with for advice [and] what they were told."[60] But it is not "impossible" to determine whether the defendants "received and relied on bad legal advice" or "did not care about complying with the legal requirements of Delaware law" without accessing the privileged communication.[61]

---

[59] Krischik Aff. Ex. 3.

[60] Tr. 60.

[61] *Id*. at 54–55.

###### B. The At Issue Exception

The plaintiffs next argue that the defendants waived the attorney-client privilege because they put the communication "at issue" when they relied upon a redacted version of that document.[62] The plaintiffs have made this argument twice—once in each motion to compel.[63] The defendants ask that the court strike the second argument because it effectively contravenes the word limit under Court of Chancery Rule 171(f).[64] It is regrettable that the plaintiffs made the same argument in two separate motions. I decline, however, to strike the second iteration of the argument because (1) it follows the inadvertent production of the challenged email and slight

---

[62] The parties discuss the at issue doctrine as both an exception to the attorney-client privilege and a form of waiver. Like the *Garner* doctrine, it is not evident that the at issue doctrine is necessarily an exception to the attorney-client privilege. An "exception" is "[s]omething that is excluded from a rule's operation." *Black's Law Dictionary* (11th ed. 2019). It follows that an "exception" to the privilege occurs if privilege has not first attached to an attorney-client communication. At times, the at issue doctrine is also described as a form of waiver. This makes sense in the case of intentional waiver, such as when a party relies on the advice of counsel as a defense. *See Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259 (Del. 1995) ("[W]aiver is viewed as the voluntary and intentional relinquishment of a known right."). But it makes less sense where the waiver is implied or unintentional unless "fairness and consistency" require disclosure. *Id.* (quoting 8 John H. Wigmore, *Evidence in Trials at Common Law* § 2327 (J. McNaughton rev. ed. 1961)). At bottom, the at issue exception "is based on principles of waiver and fairness," making the terminology largely unimportant in practice. *Princeton Ins. Co v. Vergano*, 883 A.2d 44, 59 (Del. Ch. Oct. 11, 2005).

[63] Pls.' Opening Br. in Support of First Mot. to Compel 11–13; Pls.' Second Mot. to Compel ¶¶ 18–20.

[64] Defs.' Opp'n to Pls.' Second Mot. to Compel ¶ 31.

alterations to the redactions[65] and (2) the first motion remained pending for some time through no fault of the plaintiffs.

The fact that the plaintiffs made the same argument twice also does not change the result that the at issue exception is inapplicable. A party places her attorney-client communications at issue by injecting (1) "the privileged communications themselves into the litigation," or (2) "an issue into the litigation, the truthful resolution of which requires an examination of confidential communications."[66] "Application of the at-issue exception is a fact-specific inquiry"[67] intended to prevent a party from making factual assertions that go to the heart of a dispute while claiming that privilege prevents the opposing party from taking full discovery into the issue. Put simply, a party cannot use privilege as both a sword and a shield.[68]

The plaintiffs argue that the defendants waived privilege when they submitted the email to the court with their dispositive motion briefing and claimed to rely on

---

[65] *See supra* at 8.

[66] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010).

[67] *Id.*

[68] *La. Mun. Police Empls.' Ret. Sys. v. Crawford,* C.A. Nos. 2635-N & 2663-N (Del. Ch. Jan 26, 2007) ("The exception derives from principles of waiver and fairness, metaphorically expressed as preventing a party from using the privilege as both a sword and a shield.") (citing *Baxter Int'l Inc. v. Rhone-Poulenc Rorer, Inc.*, 2004 WL 2158051, at *3 (Del. Ch. Sept. 17, 2004)); *see also Sealy*, 1987 WL 12500, at *6 ("As a general matter, a party cannot take a position in litigation and then erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position.")

advice from their proxy advisor, as reflected in the email.[69]  In doing so, the plaintiffs say the defendants "'injected a privilege-laden issue into [this] litigation' and waived the privilege."[70]  According to the plaintiffs, it is a "sham" for the defendants to contend that they relied only on the advice of AST—and not counsel—because a BioDelivery employee "forwarded that communication *to [BioDelivery's] attorneys for advice.*"[71]

These arguments miss the mark.  The defendants did not put Goodwin Procter's legal advice at issue.  The only substantive unredacted portions of the email disclose AST's advice about counting stockholder votes to determine whether the amendments had passed.  The defendants' arguments on the merits also focus solely on AST's advice.[72]  Goodwin Procter's advice is not mentioned anywhere in their brief.

The redacted email is also not a partial disclosure of legal advice that caused a waiver.  In *Tackett*, the Delaware Supreme Court found that a waiver had occurred when a partial disclosure placed the opposing party at a "distinct disadvantage"

---

[69] Pls.' Opening Br. in Support of First Mot. to Compel 11–12.

[70] *Id.* at 12 (alteration in original) (quoting *In re Comverge, Inc. S'holders Litig.*, 2013 WL 1455827, at *3 (Del. Ch. Apr. 10, 2013)).

[71] *Id.*

[72] *See* Defs.' Opening Br. 24; Defs.' Opp'n to First Mot. to Compel ¶¶ 1, 11; Pls.' Second Mot. to Compel Ex. A.

because of the inability to examine the full context of the partially disclosed information.[73]  There, the combination of an attorney's affidavit presenting the "affirmative reliance on the 'routine handling' of the case"[74] and a bad faith claim created a compelling need for the protected material.[75]  The defendants here have not affirmatively relied upon the legal advice of Goodwin Procter at any point in this case.[76]

The plaintiffs contend that Puopolo's response to Brown, "Ok,"—which was initially redacted but later unredacted—is a partial disclosure because it acknowledges privileged discussions earlier in the email chain.  Nothing in the unredacted parts of the document indicates that Puopolo is affirming AST's advice or Goodwin Procter's prior legal advice.[77]  The phrase "Ok" is vague and non-substantive.  If anything, the fact that the redaction was lifted is likely an acknowledgement that counsel should not have redacted it in the first place.

---

[73] *Tackett*, 653 A.2d at 260.

[74] *Id.* at 263.

[75] *Id.* at 260–63.

[76] *See Comverge*, 2013 WL 1455827, at *3–5 (finding no waiver when defendants did not insert any issue into the case that relied on the specific advice of counsel).

[77] *See, e.g.*, *Pfizer Inc. v. Warner-Lambert Co.*, 1999 WL 33236240, *1 (Del. Ch. Dec. 8, 1999) (holding that a party had not waived attorney-client privilege by putting attorney conversations at issue where the party represented to the court "that it w[ould] use the attorney-client privilege only as a shield, and not as a sword").

Disclosure of the redacted text is also not, as the plaintiffs assert, needed for the "truthful resolution" of what advice the defendants received in connection with the Demand.[78] The plaintiffs make much of then-Chancellor Bouchard's prior observation that there was no evidence in the record "explaining what the directors did, who they consulted with for advice, what they were told, and what they knew after the plaintiffs submitted their demand on July 31, 2019."[79] That statement, which described a basis for the denial of the plaintiffs' motion for summary judgment, did not suggest that the plaintiffs "are entitled to know what Defendants were told *before the amendments were implemented*."[80] There is no reason to believe that advice given in August 2018 is "highly probative of . . . Defendants' state of mind . . . when they rejected the Demand"[81] a year later.

It is obvious that the redacted email is relevant. It may even be helpful to the plaintiffs' case. But relevance is not a basis to invade privilege.[82] The attorney-client privilege remains intact because the advice of Goodwin Procter has not been put at issue by the defendants. Even if it had, as with the *Garner* exception, the

---

[78] Pls.' Opening Br. in Support of First Mot. to Compel 13.

[79] Tr. 60.

[80] Pls.' Second Mot. to Compel ¶ 19 (emphasis added).

[81] *Id.*

[82] *See Buttonwood*, 2018 WL 346036, at *8.

plaintiffs cannot show that they are unable to obtain the information from another source.[83]

## C. The Crime-Fraud Exception

The plaintiffs' final argument is that the document falls within the crime-fraud exception to the attorney-client privilege. Delaware Rule of Evidence 502(d)(1) provides that the privilege does not apply "[i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."[84] "To invoke the crime-fraud exception, 'a mere allegation of fraud is not sufficient.'"[85] It does not apply only because a client communicated with her counsel while engaged in criminal or fraudulent acts.[86] Instead, the proponent must "make[] a prima facie showing that the confidential communications were made *in furtherance* of a crime or fraud"[87] or "to advance, the client's criminal or fraudulent purpose."[88]

---

[83] *Vergano*, 883 A.2d at 60 (explaining that "the question of ultimate admissibility turns in substantial measure on whether the party seeking to discover the attorney-client communications placed at issue is disadvantaged because it is otherwise unable to obtain the information from an alternative source if the attorney-client privilege is respected").

[84] Del. R. Evid. 502(d).

[85] *Buttonwood*, 2018 WL 346036, at *6 (quoting *Vergano*, 883 A.2d at 54).

[86] *See id.*

[87] *Id.* (alteration in original) (emphasis added) (quoting *In re Sutton*, 1996 WL 659002, at *11 (Del. Super. Aug. 30, 1996)).

[88] *Id.* at *6 (quoting *In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014)).

The plaintiffs say that the crime-fraud exception applies because the redacted email is inconsistent with "representations made by Defendants and the positions advanced by their counsel in this case."[89] Those representations include, among others: that the Demand was rejected because the amendments were "adopted in accordance with the provisions of Section 242 of the [Delaware] General Corporation Law";[90] that "Section 141(e) independently shields [the defendants] from liability" because the defendants relied on their proxy advisor's advice;[91] and that there is "no causal link" between the August 3, 2018 email and the rejection of the Demand in July 2019.[92] In other words, the alleged "attempted fraud on the Court" occurred when "Defendants redacted their communications with Goodwin [Procter]" and submitted the email as an exhibit to their brief seeking to dismiss the case after the Board rejected the Demand while relying on Goodwin Procter's legal advice.[93]

The crime-fraud exception is not applicable here. Rule 502 requires that the advice sought must be "for the purpose of accomplishing [an] allegedly fraudulent

---

[89] Pls.' Second Mot. to Compel ¶ 13.

[90] *Id.* (quoting Krischik Aff. Ex. 1 at 7–8).

[91] *Id.* (quoting Defs.' Opening Br. 24 n.18).

[92] *Id.* (quoting Defs.' Opp'n to First Mot. to Compel ¶ 24).

[93] Pls.' Reply in Further Support of Second Mot. to Compel ¶ 15 (Dkt. 77).

scheme."[94] At the earliest, the alleged "fraud" occurred on December 6, 2019 when the defendants relied on the redacted email in connection with their dispositive motion. Logically, the August 3, 2018 email could not have been "in furtherance" of that "fraudulent scheme."[95] There are no allegations that BioDelivery sought Goodwin Procter's advice about voting results in 2018 to lie to the court nearly two years later.[96]

In that regard, this case is different from the cases on which the plaintiffs rely. In one case, the court noted in dicta that the crime-fraud exception might be met where counsel advised its client to undertake intentional spoliation.[97] Nothing of the sort is alleged here. In the other case cited by the plaintiffs, the United States District Court for the District of Delaware determined that the crime-fraud exception applied where there was a "reasonable basis to suspect" that the plaintiff or its counsel intentionally misrepresented an agreement's creation date to the court to resolve a

---

[94] *Buttonwood*, 2018 WL 346036, at *7–8; *see also* Del. R. Evid. 502(d)(1).

[95] *See Buttonwood*, 2018 WL 316036, at *8; *see also id.* at *6 n.37 (citing Paul R. Rice, *Attorney-Client Privilege in the United States* § 8:17 (2017) ("[T]he mere fact that the client consulted the attorney before committing the illegal or fraudulent act may not, by itself, establish that the client consulted the attorney with the purpose of using his advice to assist in the perpetration of the act.")).

[96] *Id.* at *7.

[97] *Mountain W. Series of Lockton Cos. v. Alliant Ins. Servs.*, 2019 WL 2536104, at *10 n.6. (Del. Ch. June 20, 2019).

dispute over standing.[98] Here, by contrast, the defendants' representations could hardly support a "mere allegation of misconduct,"[99] much less a reasonable basis to suggest intentional fraud on this court.

In the alternative, the plaintiffs request that the court review the email discussion "*in camera* to determine the applicability of the crime-fraud exception."[100] Given the absence of a crime or fraud, or any indication that the relevant email was in furtherance of a crime or fraud, I decline to do so.[101]

## III. CONCLUSION

For the reasons stated above, the plaintiffs' First and Second Motions to Compel are denied.

*Lori W. Will*

Lori W. Will
Vice Chancellor

---

[98] *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016).

[99] *Vergano*, 883 A.2d at 54.

[100] Pls.' Second Mot. to Compel ¶ 14.

[101] *Cf. Ferguson v. Wesley Coll., Inc.*, 2000 WL 703429, at *1 (Del. Super. Ct. Apr. 24, 2000) (granting *in camera* review where it was "at least questionable as a blind threshold issue that the [challenged] minutes would fall into the category of confidential communications").